[Civ. No. 3900. Fifth Dist. Nov. 30, 1978.]

JOYCE A. MURPHY, Petitioner, v.
WORKERS' COMPENSATION APPEALS BOARD and
MARKET BASKET, Respondents.

## COUNSEL

Cadoo, Tretheway, McGinn & Morgan, R. Jeffrey Stander and William P. McGinn for Petitioner.

Edward F. Hustedt for Respondents.

## OPINION

**ANDREEN, J.**\*—Petitioner Joyce A. Murphy was working as a meat wrapper for Market Basket, a permissibly self-insured employer, when

---

\*Assigned by the Chairperson of the Judicial Council.

her estranged husband entered the store-premises and shot her in the back. Her spinal cord was severely damaged, thereby rendering her a paraplegic. Petitioner has brought this writ of review to annul the decision of the Workers' Compensation Appeals Board which found that her injury did not arise out of her employment.

FACTS

The substantial evidence in the light of the entire record (Lab. Code, § 5952; *LeVesque* v. *Workmen's Comp. App. Bd.* (1970) 1 Cal.3d 627, 635-637 [83 Cal.Rptr. 208, 463 P.2d 432]) is as follows:

Petitioner's husband, Joseph Patrick Murphy, Jr., did not like the independence that petitioner's job afforded her. He was especially threatened by the prospect that she might make more money than he. Accordingly he demanded that she quit her employment at Market Basket and when she refused, attempted to have her fired.

During the months of October and November 1975 when petitioner was working as an apprentice meat cutter at the store, Joseph Murphy repeatedly told petitioner's immediate supervisor Ernest John Filla that he did not want her working at the store. Once he picked up her knives and said she would not be back.

On January 18, 1976, petitioner separated from her husband. Starting with the separation, the husband started to harass her at the store on almost a daily basis.

During the months of January, February and March 1976, petitioner was working at the Canoga Park store. Her supervisor was Ron Gilly. During this time, Filla nevertheless saw Patrick Murphy on an average of three times a week, during which the latter stated that the petitioner belonged to him, that she was not going to work, and that he would take her life on the job at Market Basket unless she quit. At times the husband said he did not want the petitioner to work. But most of the times (approximately 50), the husband told Filla if she did not quit working at Market Basket he was going to shoot her. Whenever he mentioned killing his wife he stated he was going to kill her at the store. The specific employment at Market Basket was a basis of the husband's homicidal ruminations.

On February 26, 1976, the husband appeared at the store with a gun. Petitioner's supervisor Ron Gilly was there, as was Filla. At that time the husband displayed the gun and stated that "This is the gun I am going to use on her." Filla was instrumental in having the husband committed to a hospital, but he was discharged three days later.

During a separate meeting approximately two weeks before the shooting, decedent Joseph Patrick Murphy told Filla and Ron Gilly that he was going to kill petitioner in the store.

Petitioner repeatedly expressed concern for her safety to her supervisors. She asked for transfers or leaves of absence several times, so that she could get away from her husband. Her requests were refused.

There was some evidence that the husband's instability was not solely focused on petitioner's employment. He threatened to kill her if she divorced him. He used drugs occasionally, including heroin at least once.

The night before the shooting, the husband went to Ron Gilly's house. With Gilly were his wife and Ernest Filla and his wife. At that time, the husband informed them that he was going to go to the store and smatter petitioner's brains all over the mirrors, and that if Ron Gilly were there he would get shot too. Although Gilly was petitioner's supervisor, he told her nothing about this.

Petitioner provided the only evidence presented as to what occurred on March 11. She testified that she saw her husband come to the counter in front of where she worked. She said there was a "normal look in his eye" and that she thought he came there just to talk. He told her to come over to the counter and talk with him. She told him she was too busy working and did not have the time. It appeared to her that he might be trying to cause a "scene." He repeated his request to talk to petitioner. She again refused, telling him that she was willing to talk to him after work—which ended in one hour. Husband then left the store. Petitioner followed him to the front door and observed him getting into his camper. She returned to her work. She then saw him again at the counter. When he returned, he looked different. She knew from the way he looked that he was there to do something drastic. "If you'd have seen [husband], you'd have known. I knew just by the look in his eye and when he opened the door." He quickly drew a gun from under his coat, shot her and then killed himself.

Persuaded that *Transactron, Inc.* v. *Workers' Comp. Appeals Bd.* (1977) 68 Cal.App.3d 233 [137 Cal.Rptr. 142] governed, the board denied recovery. In *Transactron* the deceased employee, when she saw her boyfriend approach the work premises, hid in the restroom. The assailant entered the public sector of the place of employment and asked for the deceased. One employee said she thought she was in the washroom; another said she would check. The latter employee found the deceased in the restroom, who was crying and who expressed her fear of the assailant and asked that the fellow employee call the police. As the employee explained the situation to the supervisor, the assailant went towards the restroom. The supervisor attempted to stop him but was unsuccessful. The assailant entered the restroom and shot and killed the employee.

The Workers' Compensation Appeals Board found factors associated with the employment contributed to the injury, since in the absence of the unwitting assistance of the coemployee in revealing the decedent's whereabouts, it is quite possible that the attack would not have occurred. Compensation was awarded to her dependents by the board. The award was annulled by the court because the nature of the employee's duties played no part in the assailant's intent to assault her. Her presence at the place of employment merely provided a place for the assault. The nature of her duties was not a proximate cause of her injury; it was not a contributory cause of her injury. There was no aspect of her employment which intrinsically raised the level of risk. At page 239 the court stated: "Where the nature of the employee's duties places her in no particularly dangerous or isolated position, or where the risk of harm is not limited to the place of employment and where the attack occurs on the premises not because the victim was performing the duties of employment at the time of assault but because she merely was there, and where the nature of employment was not part of an assailant's plan to isolate or trap the victim, the injury does not arise out of the employment." (*Transactron, Inc.* v. *Workers' Comp. Appeals Bd., supra,* 68 Cal.App.3d at p. 239.)

 In the instant case, the risk of harm was centered at the place of employment. It is there that the husband planned to kill her. Not only was the place of employment a focus of the assailant's scheme, but the employer knew it, knew the precise day and place that the attack would take place, failed to warn the employee of the specific threat to kill the next day, and refused to grant her repeated requests for a leave of absence or transfer. Furthermore, the fact that petitioner was employed at Market Basket and the fact that she refused to speak to the decedent on the day of the shooting because she was performing her duties contributed to the decedent's motivation and precipitated the shooting.

A review of cases other than *Transactron* is instructive.

In *Ross* v. *Workmen's Comp. Appeals Bd.* (1971) 21 Cal.App.3d 949 [99 Cal.Rptr. 79], the claimant was shot while working as a clerk in a liquor store. He had a friendly relationship with a female patron and her husband shot him while on duty. The court found that the injury arose out of the employment, stating: "Even if the motivation for the shooting be characterized as personal, the causative factor of that motivation is to be found, at least in part, in claimant's work activity and ambient circumstances of his employment." (*Ross* v. *Workmen's Comp. Appeals Bd., supra,* at p. 956.) The work activity referred to was the fact that the claimant was performing work for his employer when he carried groceries to the patron's car, and "[i]f at such time, she said, 'Sit down for a minute,' a clerk, if no other customer needed to be waited upon immediately, would probably do so, if only to humor and engender the goodwill of a customer. It may be that under some circumstances, such as where a husband or a wife is suspicious of the other's faithfulness, this course of conduct could be given a sinister interpretation. Nevertheless, it cannot be said that there is not at least a contributing causative connection between the employment and the injury." (*Ross* v. *Workmen's Comp. Appeals Bd., supra,* 21 Cal.App.3d 949, 956.) The order of the Workmen's Compensation Appeals Board denying compensation was annulled.

In *California Comp. & Fire Co.* v. *Workmen's Comp. App. Bd.* (1968) 68 Cal.2d 157 [65 Cal.Rptr. 155, 436 P.2d 67], the ex-husband of the deceased arranged an elaborate ruse whereby she was directed by her employer to go to an apartment to measure a table for a pad. The ex-husband greeted her at the door with a fatal shot. An award for her dependant daughter was affirmed. The court stated: "There can be no doubt that her duties placed her in an isolated location, that the nature of her work was a factor in the husband's elaborate scheme and at the very least facilitated the assault, and that this was a contributory cause of her death. . . . [¶] That the grievance which impelled Schick to commit the homicide originated in events unrelated to Mrs. Schick's employment does not vitiate the foregoing conclusion." (*Id.,* at pp. 160-161.)

As noted above, there is a factor in the present case which was not present in *Transactron, Inc.* v. *Workers' Comp. Appeals Bd., supra,* 68 Cal.App.3d 233. Here, the employer had knowledge through its supervisors that an attack was imminent and that the attack was to occur on the premises of the employer. Nevertheless, the employee was required to

perform her duties at the precise place where her assaulter had given notice of his intention to set upon her. If any credence is given the husband's statements, the risk of harm, at least in the immediate sense, was limited to the place of employment. She was therefore exposed to a special risk arising out of her employment. The situs of the employment was more than a coincidental matter of providing a place for the assailant to find his victim.

The failure of Ron Gilly or Ernest Filla to warn petitioner on the following morning of the specific intent of the assailant to kill her deprived her of an opportunity to take measures to protect herself. This omission to give a forewarning of imminent danger contributed to the injury in a far more significant way than the unwitting assistance of the coemployee of revealing the whereabouts of the employee in *Transactron.*

Another vital difference is that in the present case one of the causes of the attack was the husband's feelings about his wife working at Market Basket. He did not want her to work there and had taken steps to force her to quit. Failing that, he attempted to have her fired. Her continued insistence on working was a substantial motivating force behind her husband's actions. (*Ross* v. *Workmen's Comp. Appeals Bd., supra,* 21 Cal.App.3d 949.)

Furthermore, on the day of the tragic occurrence, petitioner had refused to speak to her husband and told him that the performance of her duties prevented it. He left, obtained a gun and returned. In the meantime, his appearance had changed in such a way that it communicated to petitioner the fact that he intended to do something "drastic." It is apparent that petitioner's attendance to her duties was a precipitating cause of the release of her husband's hostilities.

With these factors in mind, the assault was not a private one only; there was a substantial admixture of an employment contribution. The causal connection between the employment and the injury need not be the sole cause; it is sufficient if it is a contributory cause. (*Madin* v. *Industrial Acc. Com.* (1956) 46 Cal.2d 90 [292 P.2d 892].)

The facts are not in dispute; only the legal result which flows from them. It therefore becomes a matter of law as to whether the connection between the assault and the employment was a contributory cause of the injury. (*Ross* v. *Workmen's Comp. Appeals Bd., supra,* 21 Cal.App.3d 949; *Transactron, Inc.* v. *Workers' Comp. Appeals Bd., supra,* 68 Cal.App.3d 233.)

The decision of the Workers' Compensation Appeals Board is annulled with directions to the board to take further proceedings consistent with the foregoing opinion.

Franson, J., concurred.

**BROWN (G. A.), P. J.**—I concur in the result.

To be compensable, Labor Code section 3600 requires that the injury must arise out of and be in the course of the employment. Since the shooting occurred on the job while the petitioner was working, it was indisputably in the course of employment. The sole issue is whether the injury arose out of her employment. "This requirement refers to a causal connection between the employment and the injury." (*California Comp. & Fire Co.* v. *Workmen's Comp. App. Bd.* (1968) 68 Cal.2d 157, 160 [65 Cal.Rptr. 155, 436 P.2d 67].) "In finding that the injury arose out of the employment, this court held that a sufficient causal connection between the injury and the employment is shown where the employment was a contributory cause of the injury, that where the injury occurs on the employer's premises while the employee is in the course of his employment the injury also arises out of the employment unless the connection is so remote from the employment that it is not an incident thereof, and that an injury can arise out of the employment even though the employer had no connection with or control over the force which caused the injury." (*Id.,* at p. 160.)

In this case the petitioner had been employed by Market Basket since 1971. She and Joseph Murphy were married in 1974. They separated, and she filed for dissolution of the marriage in January 1976. The shooting occurred on March 11, 1976. Their marriage was stormy and tumultuous. Joseph Murphy drank and used narcotics and had beaten petitioner on a number of occasions. He had threatened to shoot her while she was working as well as at places other than at work. Murphy was particularly irked at petitioner's working, his male ego apparently being offended by her steady employment for higher compensation than he was earning. It is clear, however, that he did not want her to work anywhere and that he was obsessed with the idea that she should not be employed. A number of times he threatened to kill petitioner on the job. On a number of these occasions he referred to killing her at the Market Basket. However, Murphy had no known basis for any animosity against Market Basket other than the fact that his wife (petitioner) worked there. Based upon

this evidence the trier of fact could reasonably have inferred that Market Basket was the place he had mentioned killing her because that was the only place she had worked during their marriage, and could have also concluded that his express purpose of killing her at work would not have been diminished wherever she was employed. Moreover, Murphy did not start harassing petitioner on the job until she left him and filed for dissolution, giving rise to the clear inferences that the job was the most convenient place where he could find her and that another principal source of his hostility was the fact she had left him and filed the dissolution proceeding.

The rule of *Transactron, Inc.* v. *Workers' Comp. Appeals Bd.* (1977) 68 Cal.App.3d 233 [137 Cal.Rptr. 142], cited and relied upon by the workers' compensation judge and the appeals board as well as the principal opinion, governs herein. The court therein stated: "The role of employment in the shooting is inconsequential when it merely provides a place where the assailant can find the victim. [Citation.] Where the nature of the employee's duties places her in no particularly dangerous or isolated position, or where the risk of harm is not limited to the place of employment and where the attack occurs on the premises not because the victim was performing the duties of employment at the time of assault but because she merely was there, and where the nature of employment was not part of an assailant's plan to isolate or trap the victim, the injury does not arise out of the employment. [Citations.]" (*Id.*, at p. 239.)

Mr. Filla, petitioner's supervisor in the meat cutting department of Market Basket, had become enmeshed in the controversy between petitioner and her husband. He had been a friend of Joe Murphy for five or six years. He saw him approximately three times a week, frequently at home. Murphy communicated to Filla repeated threats to take petitioner's life if she did not stop working, and a number of times Filla talked to Murphy (apparently successfully) about not taking drastic action against petitioner. Filla testified that after Murphy came to the store on February 11, 1976, approximately a month before the shooting, armed with a weapon, he realized Murphy was going to shoot petitioner. On one occasion Filla was instrumental in having Murphy committed to a hospital for mental treatment. He did not feel that Murphy was mentally normal.

The benefits resultant to Market Basket attributable to this activity by petitioner's supervisor are manifest as they tended to keep petitioner working without interference from Murphy and undoubtedly contributed

somewhat to her peace of mind, thus redounding to the benefit of the employer. As has been pointed out, Filla and the manager of the meat department, Gilly, were told by Murphy at Gilly's home the night before the shooting of Murphy's intent to shoot petitioner the next day at the store. Neither Gilly nor Filla told petitioner of the threat. Thus the employer's representative (Filla), after having assumed a protective stance toward petitioner, failed to warn her of the specific threat of being shot the next day. This combination of circumstances to which the employer's representative contributed placed petitioner in a special position of danger, resulting in a sufficient employment connection to cause the injury to have arisen out of the employment. (*California Comp. & Fire Co.* v. *Workmen's Comp. App. Bd., supra,* 68 Cal.2d 157.) On this basis only the order should be reversed.

I cannot agree with any other generalized statements as a basis of compensability. Absent some special relationship and circumstances such as those present herein, an employer cannot be held to be lord protector of its employees against vicious personal assaults by third parties arising out of private and personal domestic or other controversies. The fact that the employment of one of the quarreling parties is a cause of the dispute and furnishes the motivation for the attack does not cause the controversy to be any the less private and personal. Nor can a private business be held to have a responsibility to police the private relationships of its employees at the peril of being held responsible for compensation benefits. In the face of such threats, certainly an employer cannot be said to have a duty to transfer an employee or place him on a leave of absence or, as some suggested, to discharge him.[1] The employee, not the employer, has the obligation to look out for and resolve the problems and controversies arising out of the employee's private relationships.

The petition of respondent Market Basket for a hearing by the Supreme Court was denied January 24, 1979.

---

[1] It takes no guesswork to know what the decision of a union grievance committee would be if the employer attempted to justify a discharge of an employee on the ground that someone was threatening to attack the employee on the job.