Opinion
 

 ZENOVICH, Acting P. J .
 

 The issue before us in this case is whether the deaths of two employees, Vargas Castellanos and Salvador Macias Vargas, who were shot in a bunkhouse arose out of and occurred in the course of their employment. The Workers’ Compensation Appeals Board (Board) denied reconsideration of the trial judge’s award of compensability. Petitioner, State Compensation Insurance Fund (petitioner) filed a petition for a writ of review from the Board’s decision, which we granted. The case was submitted to the trial judge on an agreed statement of facts (contained in Return to Writ of Review) which we hereby adopt:
 

 “Agreed Statement of Facts
 

 “Late Sunday night, 10-8-78, Salvador Vargas, Miguel Castellanos, and Lourdes Mesa, died as a result of gunshot wounds inflicted by either Keith Daniel Williams or Robert Leslie Tyson, or both.
 

 “The assailants, individually or jointly, did not employ the victims, nor were any of the victims fellow employees of either of the assailants at the time of the injuries and deaths. Castellanos and Vargas were employed as dairy milkers by the Soares Family Trust (hereinafter referred to as employer). At the time of their deaths, these two men lived at a bunkhouse located at 1861 No. Highway 99 in Merced, California. These men were shot and killed in their bunkhouse residence.
 
 *647
 
 The house is and was owned by the employer, and provided to employees (as in the instant case), rent free as additional compensation for services arising from their employment, and as a convenience to the employer, at the time of the incident of injury. Their bodies were discovered in the bunkhouse the morning following 10-8-78.
 

 “The body of Lourdes Mesa was discovered at a remote location in Tuolumne County on 10-13-78, with three gunshot wounds to the right portion of her back and one gunshot wound in her head. Ms. Mesa may have been living in the bunkhouse and cohabitating with Miguel Castellanos, but his dwelling was not provided to her as compensation for services rendered to the employer, and her employment at the time of the incident of injury is denied.
 

 “On Friday afternoon, 10-6-78, Castellanos, Vargas and Mesa arrived at a garage sale in the area of Galt, Ca. Most of the items being sold at the garage sale had been stolen by Keith Williams and Robert Tyson in September. The items to be sold were brought to the house of Robert and Karen Tyson at 26756 Nichols Road, Galt, California, by Cindy Williams and Betty Farnsworth. Betty and Cindy are allegedly sisters, and Cindy was purportedly a former wife of Keith Williams. Keith, Cindy and Betty had been living at the Tyson home as early as October 4, and they all assisted in the garage sale.
 

 “It was late afternoon when Castellanos, Vargas and Mesa arrived at the garage sale. However, after purchasing a few items there, and discussing prices, Castellanos mentioned to Williams that his car might be for sale. Following this discussion, Keith Williams took the vehicle, a 1973 Plymouth Roadrunner, for a test drive, following which Castellanos and his group left the sale with an understanding they would return the next day to continue negotiations for the car. After the three left the sale, Keith Williams began to tell Robert Tyson how easy it would be to ‘blow away’ Mexicans. He told everyone in the house how fast the car was and then started mentioning about how he could have forced the people into the trunk of the car and taken them to a field, and could have blown them away because everything that belonged to the car, the pink slip and everything, was inside the glove box of the car.
 

 “On Saturday, 10-7-78, Williams instructed Betty to write out a check for $1,500 from a checkbook that was taken in late September, along with the other stolen items. This was. the check that Williams pre
 
 *648
 
 sen ted to Miguel V. Castellanos when he arrived at the Tyson residence on Saturday. Castellanos subsequently left in another vehicle, but indicated that he would mail back the pink slip as soon as the check had cleared. Following Castellanos’ departure, on Saturday, Williams was heard to have commented several times that he could ‘blow away niggers and Mexicans’ and also to have asked Robert Tyson ‘are you with me?’ and each time Tyson stated ‘Yes’. Williams also remarked that he had seen Castellanos with a big wad of money.
 

 “Saturday night Williams cleaned his gun, and sent Karen and Cindy out to a store for ammunition. When the women returned, Keith Williams and Robert Tyson were discussing their plans to go down to Merced and rob the Mexican people of money, plus anything else that they could find of value. It was important to Williams to get a hold of the bogus check before it cleared the bank.
 

 “At approximately 4:00 PM, on the afternoon of 10-8-78, Keith Williams and Robert Tyson departed the Tyson residence in Galt, Ca. headed for Merced. While traveling to Merced, Williams kept talking about ‘killing the Mexicans or blowing them away’. At about 8:00 PM, Williams and Tyson were in the vicinity of the bunkhouse where Miguel Castellanos, Salvador Vargas and possibly, Lourdes Mesa, lived, but were having difficulty finding it.
 

 “Williams then stopped and talked with Joe Scoto, who was a foreman for the employer and lived on the employer’s property. Scoto gave Williams directions as to the location of the bunkhouse. Tyson and Williams then went to the bunkhouse where Castellanos, Vargas and possibly Mesa lived. At the time they arrived, three other people were also there, Leo Macias, Nadine Padilla and Sylvia Wharton. The earlier sale of the automobile was discussed as well as a discussion about the purchase of a handgun. About 9 or 9:30 PM, the last of the other visitors, Mr. Macias, departed the residence leaving behind Castellanos, Vargas, who was upstairs sleeping, Mesa, Williams and Tyson. After consuming several drinks, Williams drew his gun and held it against Castellanos’ throat. Everyone then laughed it off as a joke. Then Tyson and Williams left the bunkhouse and drove to another location and parked. Williams told Tyson he was to make anyone downstairs ‘lay down’ while Williams would ‘take out’ the one upstairs. Williams drove the car back to the farm house and then both men, armed with a handgun went inside.
 

 
 *649
 
 “Miguel Castellanos, who answered the door, was ordered to lay down on his stomach; Tyson stood over him with a drawn handgun. Williams ran upstairs screaming ‘where’s the money’. Then Williams came downstairs and took Castellanos upstairs with Salvador Vargas and made them lie down on their stomachs. Tyson took Lourdes Mesa to a downstairs bedroom, held a gun on her, and made her sit on the bed. Tyson searched the bedroom drawers for money. Meanwhile, Williams remained upstairs and Tyson could hear doors and drawers upstairs being slammed. About five minutes later, there was one gunshot, then 2 or 3 more. Vargas had been shot once in the back of the head; M. Castellanos had been shot twice and the fatal wound was caused by a gunshot to the back of the head.
 

 “Williams held the gun on Lourdes Mesa while the three of them left the bunkhouse and departed in the car. During the course of their drive in the vehicle, they stopped to purchase some beer and then proceeded to drive somewhere in the Stanislaus or Tuolumne Co. where Williams raped Lourdes Mesa in the back seat of the vehicle as Tyson drove it.
 

 “The car was driven to a rural location near the City of Sonora. The car was stopped and the lights and the motor were turned off and then Williams got out of the car with Mesa and forced her into a remote area where he eventually shot her four times. When Williams rejoined Tyson at the car, he told him that he had had sex with Mesa and then killed her. After that, the two men drove back to Galt. From there, Williams departed for San Francisco with Cindy Williams and Betty Farnsworth.”
 

 This ends the “Agreed Statement of Facts.”
 

 The workers’ compensation judge granted the decedents’ survivors death benefits and funeral expenses.
 

 Petitioner then filed petitions for reconsideration alleging that (1) the judge acted without or in excess of his powers in rendering the findings and awards, and (2) the evidence did not justify the findings o'f fact and awards.
 

 The trial judge recommended that the petitions be denied. He concluded that the Vargas case was compensable for two reasons: (1) because the cause of death was not personal as between decedent and the assailants; and/or (2) because decedent by being provided a farm
 
 *650
 
 bunkhouse was placed in a position of danger. Likewise, the Castellanos case was found to be compensable because he was provided a farm bunkhouse and was placed in a position of danger.
 

 Thereafter, the Board, in a two-to-one decision, denied petitioner’s petition for reconsideration. In their opinion and order denying reconsideration, the majority held that there was no personal motive to kill Vargas.
 

 “The Agreed Statement of Facts does
 
 not
 
 establish that Vargas participated in any of the negotiations concerning the car sale between Castellanos and the assailants on October 6 and 7, 1978, nor does it establish that Vargas had any other contacts with the assailants before going to sleep on the night of the fatal shooting. Based on our review of the record, including the reasons discussed by the workers’ compensation judge in his Report and Recommendation on Petitions for Reconsideration, we are persuaded that the workers’ compensation judge was justified in finding no personal motive to kill Vargas.”
 

 The majority continued that the judge was justified in finding that there was a work connection which constituted a contributory cause of the injury. “In his Opinion on Decision, the workers’ compensation judge noted as follows:
 

 “‘. . . Inasmuch as Castellanos was making reasonable use of the bunkhouse at the time of the robbery, and the fact that placing Mexican farm laborers into farm bunkhouses places them, in positions of danger, particularly from acts such as robbery, the risk of such incidents is not that remote and unconnected and one that should be borne by the employing farmer. This was true, of course, for Vargas as well as for Castellanos. Connection with the bunkhouse
 
 is
 
 connection with employment.’
 

 “In his Report and Recommendation on Petition for Reconsideration, the workers’ compensation judge noted as follows:
 

 “‘[It] appears that the deaths were industrial.
 

 “T. On October 8, 1978, the assailants traveled from Galt to Merced to the bunkhouse of the decedents in part to retrieve a forged check and in part to rob them.
 

 
 *651
 
 “‘2. At sometime between 8:00 p.m. and 9:00 or 9:30 p.m. on October 8, 1978 the assailants went to the bunkhouse, and while there, discussed the sale of the car and the purchase of a handgun with Castellanos.
 

 “‘3. At about 9:00 or 9:30 p.m. on October 8, 1978, after three other people present at the bunkhouse left, the assailants remained and consumed several alcoholic drinks with one of the decedents.
 

 “‘4. Thereafter, the assailants left the bunkhouse, drove to another location, parked and discussed how the robbery was to take place; they then drove back to the bunkhouse and robbed and killed the occupants.
 

 “‘The reasonable inference from this series of events here is that the assailants
 
 after seeing the bunkhouse
 
 found the occupants
 
 vulnerable
 
 to robbery and returned to commit it.’
 

 “The bunkhouse, and thus the work environment, did contribute to the shootings.” (Second and third italics added.)
 

 The dissenting Board member concluded that, for the purposes of the criminal intent and plan of the assailants, the bunkhouse was just another abode and it, as well as the employment relationship, had an extremely remote connection or bearing, if any at all, to the assailants’ plan to harm Vargas and Castellanos.
 

 Discussion
 

 Respondents first contend that this court’s scope of review is limited “to a finding of whether substantial evidence does exist on the entire record to justify the finding of a lack of
 
 ‘entirely personal motives.’’”
 
 Not so.
 

 Respondents are correct that issues not raised in a petition for reconsideration are waived.
 
 (U.S. Auto Stores
 
 v.
 
 Workmen’s Comp. App. Bd.
 
 (1971) 4 Cal.3d 469, 476-477 [93 Cal.Rptr. 575, 482 P.2d 199].) However, in the case before us, the petition for reconsideration raised several issues including whether there existed a personal motive for the killings, whether the criminal aspect of the killings may be classified as a neutral cause of death and whether, as a matter of law, the providing of a bunkhouse to Mexican employees places them in a position of increased risk of harm from the danger which ultimately led to their deaths. The
 
 *652
 
 Board’s decision denying reconsideration touched on these issues. Thus, this court’s scope of review is not so limited as respondents contend.
 

 Instead, our review of the Board’s award is confined to a determination whether, under applicable principles of law, the award is supported by substantial evidence. If the Board’s findings are supported by inferences which may be fairly drawn from the evidence, even though the evidence is susceptible of opposing inferences, we cannot disturb the award.
 
 (Judson Steel Corp.
 
 v.
 
 Workers’ Comp. Appeals Bd.
 
 (1978) 22 Cal.3d 658, 664 [150 Cal.Rptr. 250, 586 P.2d 564];
 
 Smith
 
 v.
 
 Workers’ Comp. Appeals Bd.
 
 (1981) 123 Cal.App.3d 763,
 
 774
 
 [176 Cal.Rptr. 843].) Otherwise stated, the Board’s findings and conclusions on questions of fact are conclusive and final so long as they are based upon the entire record and are supported by substantial evidence.
 
 (LeVesque
 
 v.
 
 Workmen’s Comp. App. Bd.
 
 (1970) 1 Cal.3d 627, 637, fn. 19 [83 Cal.Rptr. 208, 463 P.2d 432].)
 

 It is well settled that, under Labor Code section 3600, in order to be compensable the injury must
 
 arise out of
 
 and be
 
 in the course of
 
 employment. Generally, “in the course of employment” refers to the time and place of the injury.
 
 (Argonaut Ins. Co.
 
 v.
 
 Workmen’s Comp. App. Bd.
 
 (1967) 247 Cal.App.2d 669, 676 [55 Cal.Rptr. 810].) The phrase “arise out of employment” refers to a causal connection between the employment and the injury.
 
 (California Comp. & Fire Co.
 
 v.
 
 Workmen’s Comp. App. Bd.
 
 (Schick) (1968) 68 Cal.2d 157, 160 [65 Cal.Rptr. 155, 436 P.2d 67].)
 

 Petitioner initially contends that the “bunkhouse rule” establishes only that an injury to an employee making reasonable use of a bunkhouse occurs in the course of employment, yet the injured worker must also establish that his injury, while occurring in the bunkhouse, also arose out of his employment.
 

 Respondents contend that where an employee is shot to death in a bunkhouse the death is compensable unless the evidence clearly establishes that the killing resulted from entirely personal motives. They contend that a separate finding of arising out of employment is not mandated in a bunkhouse case such as this and injuries have been held to be arising out of employment simply because they were sustained during and at the place of employment. We do not think this is the rule for the following reasons.
 

 
 *653
 
 In our opinion, the bunkhouse rule does not dispense with the requirements of Labor Code section 3600. We find no cases in California indicating that an injury sustained by an employee in a bunkhouse is per se compensable. Our review of these cases reveals that invocation of the bunkhouse rule establishes that the injury occurred in the course of the employment but there also must be some connection between the employment and the injury,
 
 [1]
 
 or an injury arising out of the reasonable use of the premises,
 
 [2]
 
 or the bunkhouse must place the employee in a peculiar danger.
 
 [3]
 

 It is clear that the bunkhouse rules establish that Vargas and Castellanos were killed in the course of their employment. The real question then is whether the deaths arose out of their employment or, alternatively, when employees who are in a bunkhouse are killed by a third party’s intentional act are the deaths compensable?
 

 Generally, an injury which grows out of a personal grievance between the injured employee and a third party does not arise out of the employment if the assault occurred merely by chance during working hours at the place of employment, or if the employer’s premises do not place the injured employee in a peculiarly dangerous position. (2 Hanna, Cal. Law of Employee Injuries and Workmen’s Compensation
 
 *654
 
 (2d ed. 1981 rev.) § 10.03[3], p. 10-15.) Thus, when a third party intentionally injures the employee and there is some personal motivation or grievance, there has to be some work connection to establish compensability.
 
 (California Comp. & Fire Co.
 
 v.
 
 Workmen’s Comp. App. Bd. (Schick),
 
 supra, 68 Cal.2d 157, 161-162;
 
 California State Polytechnic University
 
 v.
 
 Workers’ Comp. Appeals Bd.
 
 (1982) 127 Cal.App.3d 514, 518-520 [179 Cal.Rptr. 605];
 
 Murphy
 
 v.
 
 Workers’ Comp. Appeals Bd.
 
 (1978) 86 Cal.App.3d 996, 1002 [150 Cal.Rptr. 561] (per Andreen, J., Brown, P. J., concurring in result);
 
 Transactron, Inc.
 
 v.
 
 Workers’ Comp. Appeals Bd.
 
 (1977) 68 Cal.App.3d 233, 238-239 [137 Cal.Rptr. 142];
 
 Ross
 
 v.
 
 Workmen’s Comp. Appeals Bd.
 
 (1971) 21 Cal.App.3d 949, 956 [99 Cal.Rptr. 79].)
 
 [4]
 
 The reason for this rule would appear to be that when it is known that the assault was committed out of a personal motivation or grievance, then the chain of causation between the employment and the injury is broken. Thus, when the assault is personally motivated, it could conceivably occur anywhere, thus precluding employer contribution resulting in noncompensability. In other words, the connection between the employment and the injury is so remote that the injury is not an incident of the employment. As stated in
 
 Transactron,
 
 which involved a personally motivated killing: “The role of employment in the shooting is inconsequential when it merely provides a place where the assailant can find the victim. [Citation.] Where the nature of the employee’s duties places her in no particularly dangerous or isolated position, or where the risk of harm is not limited to the place of employment and where the attack occurs on the premises not because the victim was performing the duties of employment at the time of assault but because she merely was there, and where the nature of employment was not part of an assailant’s plan to isolate or trap the victim, the injury does not arise out of the employment.”
 
 (Transactron, Inc.
 
 v.
 
 Workers’ Comp. Appeals Bd., supra,
 
 68 Cal.App.3d at p. 239.)
 

 However, if the assault is not personally motivated then the injury is compensable. This would comport with the general rule that an injury may still arise out of employment even if the cause of injury is unconnected with the employment in the sense that the employer neither anticipated nor had control over the cause of the injury.
 
 (Madin
 
 v.
 
 Industrial Acc. Com.
 
 (1956) 46 Cal.2d 90, 92-93 [292 P.2d 892].)
 

 
 *655
 
 As stated in
 
 California Comp. & Fire Co.
 
 v.
 
 Workmen’s Comp. App. Bd. (Schick),
 
 supra, 68 Cal.2d 157, 160, citing
 
 Madin, supra,
 
 46 Cal. 2d 90: “In finding that the injury arose out of the employment, this court held that a sufficient causal connection between the injury and the employment is shown where the employment was a contributory cause of the injury, that where the injury occurs on the employer’s premises while the employee is in the course of his employment the injury also arises out of the employment unless the connection is so remote from the employment that it is not an incident thereof, and that an injury can arise out of the employment even though the employer had no connection with or control over the force which caused the injury. It was also held that an injury is compensable where the employee is brought into a position of danger by the employment even though the risk could not have been foreseen by the employer, and, finally, that reasonable doubts as to whether an injury is compensable are to be resolved in favor of the employee.”
 

 The
 
 Madin
 
 court found compensable injuries to 24-hour managers of rental property who were injured when a bulldozer which was being used in the neighborhood was started by some boys and pushed through the walls of the employees’ bedroom. The nonpersonally-motivated third party who commits the assault on an employee in the course of his employment would thus be analogous to the bulldozer in
 
 Madin.
 

 Based on the foregoing cases, we divine the following principles: Injuries to employees in bunkhouse are not per se compensable; if a third party assaults and injures the employee while in the course of employment (including being in a bunkhouse) and the third party acted out of purely personal motives there is no compensability. However, if the
 
 employee
 
 can also show there was some employment connection or contribution, i.e., an industrial cause of the injury so as to establish the arising-out-of element, then there is compensability. Such cause need not be the sole cause and need only be a contributing cause. Finally, if the third party’s assault causing the injury occurs in the course of employment and is committed for unknown motives or no motive at all, i.e., for nonpersonal motives, the injury is compensable.
 

 In the instant case, the trial judge’s conclusion that Vargas was not killed out of a personal motive is unsupported by the evidence. After seeing Vargas and Castellanos at the garage sale, Williams spoke about how easy it would be to “blow away” Mexicans. Although Williams dealt thereafter with Castellanos; he continued to speak about
 
 *656
 
 how he could “blow away niggers and Mexicans” and about going to Merced to rob the “Mexican” people. Although it was important for Williams to get ahold of the bogus check from Castellanos before it cleared the bank, at all times Williams and his cohorts intended to commit a racially motivated killing involving the “Mexicans,” i.e., Vargas and Castellanos. In our opinion, the Board ignored the racial aspect of the killings but merely focused on the fact that Vargas did not participate in the negotiations for the sale of Castellanos’ car. Even though Vargas may have been a virtual stranger to the killers, it is difficult to see how the Board could possibly have concluded that there was no personal motivation for the killing of Vargas. Thus, the racial motive could cut off the causation between the employment and the deaths. The evidence showed that the cause of the deaths was unrelated to employment. The motive was personal and it was unreasonable for the Board to conclude otherwise.
 

 Finding a personal motivation for the killings, we next examine whether there was sufficient evidence of an employer contribution.
 
 (Murphy
 
 v.
 
 Workers’ Comp. Appeals Bd., supra,
 
 86 Cal.App.3d 996.)
 

 In the case before us, substantial evidence does not support the Board’s conclusion that there was a work connection. First, the trial judge improperly took notice of a fact which was unsupported by the record. The judge stated in part, as quoted by the Board, . the fact that placing Mexican farm laborers into farm bunkhouses places them in positions of danger, particularly, from acts such as robbery, the risk of such incidents is not that remote and unconnected and one that should be borne by the employing farmer. This was true, of course, for Vargas as well as Castellanos. Connection with the bunkhouse
 
 is
 
 connection with employment.’”
 

 While the trial judge’s conjecture about “Mexican” bunkhouses may be true in most instances, we find nothing in the record before us to establish that the bunkhouse was isolated so as to expose the decedents to a peculiar risk and establish a work connection. Simply stated, the record contains no evidence about the bunkhouse’s environs. Respondents could at least have introduced pictures of the bunkhouse and its surroundings. For all the record shows, there could have been numerous bunkhouses, thus minimizing the danger due to isolation, rather than one bunkhouse.
 

 
 *657
 
 Moreover, the trial judge and the Board relied on the fact that the assailants on the night of the killing came to the bunkhouse, left and then returned which supposedly established “‘[t]he reasonable inference ... that the assailants
 
 after seeing the bunkhouse
 
 found the occupants
 
 vulnerable
 
 to robbery and returned to commit it.’” Not true. The only reasonable inference on this record is that the assailants “cased” the bunkhouse and determined that nothing precluded an attack. It was improper for the Board and the trial judge to then make the unreasonable inference that the victims were vulnerable because of the bunkhouse. The fact that the bunkhouse was not a barrier to the intended assault is not the same as facilitating or contributing to the attack.
 

 Third, respondents’ argument that the fact that defendants’ foreman directed the assailants to the bunkhouse does not support the finding of compensability
 
 (Transactron, Inc.
 
 v.
 
 Workers’ Comp. Appeals Bd., supra,
 
 68 Cal.App.3d 233, 238), nor does the characterization of the “bunkhouse” as a “farmhouse” show that it was rural and isolated. Such slender threads do not establish substantial evidence.
 

 Since we find nothing in the record before us to show an employer contribution, i.e., that the bunkhouse’s locale contributed to the deaths of the victims at the hands of third parties, the Board’s orders in 79 F 44910 and 79 F 44915 are annulled and the matter is remanded to the Board for further proceedings consistent with this opinion.
 

 Hanson (P. D.), J., and Conklin, J.,
 
 *
 
 concurred.
 

 [1]
 

 See
 
 Larson
 
 v.
 
 Industrial Acc. Com.
 
 (1924) 193 Cal. 406, 411 [224 P. 744] (direct causal connection between employment and exploding bunkhouse stove causing injuries);
 
 State Comp. Ins. Fund
 
 v.
 
 Indus. Acc. Com.
 
 (1924) 194 Cal. 28, 31 [227 P. 168] (direct causal connection between employment and live-in maid’s injury due to slipping);
 
 Union Oil Co.
 
 v.
 
 Industrial Acc. Com.
 
 (1931) 211 Cal. 398, 403-404 [295 P. 513] (captain of ship drowning after falling off dock when he went to vessel to get an early start);
 
 Fidelity & Cas. Co.
 
 v.
 
 Industrial Acc. Com.
 
 (1959) 176 Cal.App.2d 541, 544-545 [1 Cal.Rptr. 567] (employee in hot and humid climate drowning after swimming off company dock arose out of employment);
 
 Employers’ Etc. Corp.
 
 v.
 
 Indus. Acc. Com.
 
 (1940) 37 Cal.App.2d 567, 573-574 [99 P.2d 1089] (household servant injured while fixing hem arose out of employment as she was required to be neat in appearance and was always on call).
 

 [2]
 

 Argonaut Ins. Co.
 
 v.
 
 Workmen’s Comp. App. Bd., supra,
 
 247 Cal.App.2d 669, 678-679 (farm boy’s injury sustained during leisure time when fell through glass door during roughhousing held reasonable use of employer’s premises);
 
 Leffler
 
 v.
 
 Workers’ Comp. Appeals Bd.
 
 (1981) 124 Cal.App.3d 739, 743 [177 Cal.Rptr. 552] (unreasonable use of employer’s premises where employee dived off balcony for bet and subsequently died).
 

 [3]
 

 Truck Ins. Exchange
 
 v.
 
 Ind. Acc. Com.
 
 (1946) 27 Cal.2d 813 [167 P.2d 705] (farmhand killed at dangerous intersection which the employer was aware of);
 
 Aubin
 
 v.
 
 Kaiser Steel Corp.
 
 (1960) 185 Cal.App.2d 658, 663 [8 Cal.Rptr..497] (employee’s use of employer’s private road which exposed him to peculiar danger and employee was killed by employer’s train at road-railroad intersection);
 
 Industrial Indemnity Co.
 
 v.
 
 Workers’ Comp. Appeals Bd. (Smith)
 
 (1980) 45 Cal.Comp.Cases 343.
 

 [4]
 

 The scope of personal grievance assault cases is not limited to instances of lovers’ quarrels as respondents imply. (See, e.g.,
 
 Western Greyhound Lines
 
 v.
 
 Industrial Acc. Com.
 
 (1964) 225 Cal.App.2d 517 [37 Cal.Rptr. 580];
 
 California Comp. & Fire Co.
 
 v.
 
 Workmens Comp. App. Bd. (Schick), supra,
 
 68 Cal.2d 157, 161-162.)
 

 *
 

 Assigned by the Chairperson of the Judicial Council.